1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVEN FRYMAN,

11              Plaintiff,                    No. CIV S-07-2636 JAM DAD P

12        vs.

13   A. TRAQUINA, et al.,

14              Defendants.           FINDINGS AND RECOMMENDATIONS

15   _____/

16        Plaintiff is a state prisoner proceeding through counsel with a civil rights action

17   seeking relief under 42 U.S.C. § 1983.  The matter is before the court on the parties' cross-

18   motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

19                              **BACKGROUND**

20        Plaintiff is proceeding on his original complaint against defendants Traquina and

21   Noriega.  Therein, plaintiff alleges as follows.  Plaintiff suffers from a growth on the inner part of

22   the left side of his chest.  At the time he informed defendants of the growth, it was enlarging in

23   size each day and was causing him increasing discomfort.  On October 11, 2006, plaintiff saw a

24   specialist, Dr. Eisenberg, who told him that he had a gynecomastic cyst and that surgery was an

25   acceptable treatment for the condition.  On April 16, 2007, plaintiff saw another specialist, Dr.

26   Young, and he too recommended surgery to treat the condition.  (Compl. Attach. at 1.)

                                          1

1      Nonetheless, defendant Traquina, Chief Medical Officer at CSP-Solano,

2  determined that surgery would be simply cosmetic and was therefore unnecessary.  Defendant

3  Noriega, the Acting Chief Physician and Surgeon at CSP-Solano, agreed with defendant

4  Traquina.  Plaintiff maintains that the defendants failed to address or consider his concerns about

5  the pain he experienced when he touched the affected area, laid on it, brushed against it, or wore

6  a t-shirt over it.  Plaintiff also alleges that he received nothing from defendants by way of pain

7  management medication.  Plaintiff concludes that defendants Traquina and Noriega have violated

8  his rights under the Eighth Amendment by failing to treat his serious medical condition and the

9  pain he suffers as a result thereof.  (Compl. Attach. at 1-2.)

10                              **PROCEDURAL HISTORY**

11      At screening the court determined that plaintiff's complaint appeared to state

12  cognizable claims for relief against defendants Traquina and Noriega, and in due course, the

13  United States Marshal served plaintiff's complaint on them.  On March 13, 2008, defendants

14  filed an answer.  On March 24, 2008, this court issued a discovery order.  The parties

15  subsequently filed cross-motions for summary judgment.  On October 24, 2008, the undersigned

16  issued findings and recommendations, recommending that both parties' motions be denied

17  without prejudice.  On January 15, 2009, the assigned district judge adopted the findings and

18  recommendations in full and denied the summary judgment motions without prejudice.

19      On June 10, 2009, defendants filed a second motion for summary judgment,

20  which plaintiff opposed.  On December 23, 2009, the undersigned issued findings and

21  recommendations, recommending that defendants' motion be denied once again.  On February

22  19, 2010, the assigned district judge adopted the findings and recommendations in full and

23  denied the motion.  Thereafter, the parties appeared before the undersigned for a status

24  conference, and plaintiff's then-recently retained counsel moved to modify the scheduling order.

25  Good cause appearing, the court granted plaintiff's motion and allowed the parties to file the

26  pending cross motions for summary judgment.  Both parties have also filed replies.

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

1    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5    return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6    1436 (9th Cir. 1987).

7          In the endeavor to establish the existence of a factual dispute, the opposing party

8    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

9    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

10    versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

11    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

12    genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

13    committee's note on 1963 amendments).

14          In resolving the summary judgment motion, the court examines the pleadings,

15    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18    court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23    show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

24    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25    'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

26    /////

**OTHER APPLICABLE LEGAL STANDARDS**

I. Civil Rights Act Pursuant to 42 U.S.C. § 1983

The Civil Rights Act under which this action was filed provides as follows:

Every person who, under color of [state law] . . . subjects, or causes
to be subjected, any citizen of the United States . . . to the
deprivation of any rights, privileges, or immunities secured by the
Constitution . . . shall be liable to the party injured in an action at
law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II. Eighth Amendment and Adequate Medical Care

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

1  acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

2  Seiter, 501 U.S. 294, 298-99 (1991).

3    Where a prisoner's Eighth Amendment claims arise in the context of medical

4  care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

5  deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth

6  Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

7  and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050,

8  1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

9  (9th Cir. 1997) (en banc).

10    A medical need is serious "if the failure to treat the prisoner's condition could

11  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

12  McGuckin, 974 F.2d at 1059 (quoting Estelle v. Gamble, 429 U.S. at 104).  Indications of a

13  serious medical need include "the presence of a medical condition that significantly affects an

14  individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical

15  need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.

16  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

17    If a prisoner establishes the existence of a serious medical need, he must then

18  show that prison officials responded to the serious medical need with deliberate indifference.

19  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

20  deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

21  which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

22  (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

23  to medical care, however, "the indifference to his medical needs must be substantial.  Mere

24  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

25  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

26  105-06).  See also Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in

diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835 (quoting Whitley, 475 U.S. at 319).

Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from a delay in providing care, a plaintiff must show that the delay was harmful. See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). See also McGuckin, 974 F.2d at 1060.

Finally, mere differences of opinion between a prisoner and prison medical staff as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim. Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I. Plaintiff's Statement of Undisputed Facts and Evidence

Plaintiff's statement of undisputed facts is supported by citations to a declaration signed under penalty of perjury by plaintiff. It is also supported by citations to plaintiff's medical records, his inmate appeals and prison officials responses thereto, and various medical articles related to gynecomastia.

The evidence submitted by plaintiff establishes the following. On August 25, 2005, shortly after his arrival at CSP-Solano, plaintiff asked to see a prison physician due to a

lump in his left breast.  Dr. William Chen examined plaintiff and found a tender mass measuring 3.0 x 2.0 centimeters.  Dr. Chen prescribed plaintiff Motrin for the pain caused by the growth. However, because no action was taken to treat the lump, and because plaintiff believed the lump had grown in size, he requested treatment for the lump again a few months later.  (Pl.'s SUDF 1-3, Exs. A-C.)

Plaintiff received an order to see an outside medical provider for a mammogram, which he underwent on November 7, 2005.  The mammogram showed the existence of fibrous glandular tissues in the left breast, which was indicative of a possible gynecomastia.  (Pl.'s SUDF 3-4, Exs. A-C.)

On December 16, 2005, plaintiff filed another request to see a physician and indicated that he had not received the results from his mammogram.  On March 6, 2006, plaintiff still had not heard the results of his mammogram and filed a heath care services request form explaining that he was very concerned about the lump on his left chest because it appeared to be growing in size.  Plaintiff also submitted additional health care services request forms in May and July 2006.  At that time plaintiff again indicated his concern about the lump continuing to grow in size.  He also complained about the ever-increasing pain he was suffering as a result of the growth.  (Pl.'s SUDF 5-7, Exs. D-F.)

On August 2, 2006, plaintiff underwent a second mammogram.  The mammogram showed the size of the growth had become more prominent as compared to the first mammogram taken in November 2005.  On the same day, plaintiff saw Dr. Eisenberg with Queen of the Valley Hospital.  Dr. Eisenberg observed that plaintiff had "left-sided gynecomastia with some lymphadenopathy" and noted that fibrous glandular tissue had been identified in November 2005. Dr. Eisenberg ordered additional follow-up tests.  (Pl.'s SUDF 8-9, Ex. G.)

On October 5, 2006, plaintiff submitted a health care services request form, asking to see a specialist for the growth in his chest.  He indicated that he was suffering from increasing pain.  On October 11, 2006, plaintiff saw Dr. Eisenberg again and the doctor observed

1   that, compared to the last time he saw plaintiff on August 2, 2006, the growth had increased in

2   size from four to five centimeters to eight to nine centimeters.  Dr. Eisenberg remarked that

3   plaintiff's left gynecomastia was considerable in degree and quite tender.  He recommended

4   surgery to remove the growth because, in his opinion, the condition was "likely to be progressive

5   and [the] cause of considerable distress" to plaintiff.  In an addendum dated October 16, 2006,

6   Dr. Eisenberg recommended that a plastic surgeon perform the excision of the growth because

7   general surgeons tend to produce considerable deformity in performing such excisions.  (Pl.'s

8   SUDF 10-13, Exs. H-J.)

9       On November 21, 2006, and again on January 12, 2007, plaintiff submitted

10  additional health care services request forms, inquiring when his surgery would take place

11  because the growth was causing him constant pain.  He did not receive any response, so he filed

12  an administrative grievance regarding his medical care on November 26, 2006.  Therein, plaintiff

13  asked for the surgery Dr. Eisenberg recommended.  He also explained that since August 2005, he

14  had complained numerous times to medical personnel at CSP-Solano about the lump in his left

15  chest.  He explained that it had been growing in size ever since and causing him increased

16  physical pain comparable to torture.  (Pl.'s SUDF 15-17, Exs. K-L.)

17      On February 9, 2007, defendant Traquina, on behalf of defendant Noriega,

18  responded to plaintiff's administrative grievance at the first formal level of review.  Dr. Traquina

19  informed plaintiff that the Utilization Management Committee reviewed his case and decided not

20  to perform surgery because this type of procedure was considered cosmetic under the California

21  Code of Regulations.  The Utilization Management Committee's denial was based on the

22  Medical Authorization Review Committee's ("MARC") January 30, 2007, decision to deny the

23  procedure on the basis that it was cosmetic.  At the time the MARC made its decision,

24  defendants Traquina and Noriega were members of the committee.  When making the decision,

25  the defendants reviewed plaintiff's medical record.  However, neither defendant Traquina's

26  response to plaintiff's administrative grievance nor the Utilization Management Committee

9

worksheet expressly indicates that they considered plaintiff's complaints about the physical pain he suffered as a result of the growth.  Four months before the MARC decision, medical staff at CSP-Solano indicated on a Utilization Management worksheet that more conservative options had been ruled out or considered to be ineffective in meeting plaintiff's medical needs.  According to the worksheet, the form is supposed to be filled out by the Utilization Management nurse.  (Pl.'s SUDF 18-23, Exs. M-P, Traquina Decl. June 9, 2009.)

After the first formal level of review decision, plaintiff received a referral to see a plastic surgeon, Dr. Young, at the University of California San Francisco Medical Center, Division of Plastic and Reconstructive Surgery.  During the visit, plaintiff noted that he was experiencing pain and tenderness upon moving his arms.  Dr. Young recommended that plaintiff "undergo excision of the excess breast tissue."  He too recommended that a plastic surgeon perform the procedure to prevent deformation of the chest after surgery.  At the time of the visit, plaintiff indicated that on a scale of one to ten he was experiencing pain at a six.  (Pl.'s SUDF 25-26, Exs. Q-R.)

On April 16, 2007, defendant Traquina responded to plaintiff's administrative grievance at the second formal level of review.  He denied plaintiff's request for surgery, noting that "there is no medical need to excise the excessive breast tissue, hence, such procedure is considered cosmetic in nature."  After denying plaintiff's request for surgery, defendants opted to continue with a conservative approach to treatment, which consisted of providing plaintiff with Motrin as needed as well as periodic observation and mammograms.  (Pl.'s SUDF 27-28, Ex. S, Traquina Decl. June 9, 2009.)

According to plaintiff's declaration, as of September 2010, he still had a growth in his left chest that was quite tender and painful and measured approximately nine to ten centimeters in width.  Without treatment, gynecomastia tends not to decrease.  As noted above, in 2007, when plaintiff saw Dr. Young, plaintiff indicated that on a scale of one to ten he was experiencing pain at a six.  In August 2009, plaintiff told prison medical staff that he was

experiencing pain at a level of nine.  (Pl.'s SUDF 29-30, Exs. R, U-X, Z, DD, EE.)

Plaintiff's diagnosis is idiopathic gynecomastia.[1]  According to Dr. Eisenberg, based on his examination of plaintiff and his experience as an endocrinologist, plaintiff's condition would most likely continue to grow, which would most likely result in his degree of pain increasing.  This is why Dr. Eisenberg believed that plaintiff was going to need surgery.  Dr. Young agreed with Dr. Eisenberg's opinion about the need to perform the surgery on plaintiff.  According to Dr. Young, after removing plaintiff's growth, the surgeon should perform a mastopexy.  Mastopexy is not considered a cosmetic procedure.  Rather it is deemed a reconstructive type of surgery.  When Dr. Young examined plaintiff, he noticed that the growth in plaintiff's left breast was ten centimeters in width and about four centimeters in depth.

---

[1]  Gynecomastia is defined as the enlargement of the male breast due to the benign proliferation of male glandular tissue.  The condition frequently presents itself as painful breast masses.  Early onsets of gynecomastia will cause the growth of glandular tissues in the male breast.  However, gynecomastia present for more than a year will result in fibrosis of the glandular tissues.  Gynecomastia is caused by an imbalance between free testosterone and estrogen which leads to the proliferation of glandular tissues.  Painful, rapidly enlarging gynecomastia is more worrisome than long-term asymptomatic enlargement.  Usually, the gynecomastia tends to regress, especially if the condition manifests itself during the patient's puberty.  Thus, the patient often does not require any treatment other than periodic follow-up examinations.  However, therapy other than the conservative approach should be sought if the gynecomastia persists and is associated with pain.  Another indication that therapy other than the conservative approach should be sought is if the glandular breast tissue is more than four centimeters in diameter as it is unlikely to regress spontaneously in such circumstances.  (Pl.'s SUDF 31-37, Exs. V-X, Z.)  Regarding the choice of therapy, the patient may pursue either pharmacotherapy or surgery.  Pharmacotherapy consists of the use of medications aimed to alter the balance between the estrogen and the androgen in a patient with gynecomastia.  Pharmacotherapy is likely beneficial if implemented during the first year of the condition, before the glandular tissue in the breast turns into fibrotic tissue.  After the onset of fibrotic tissue, pharmacotherapy will not be effective.  Contrary to pharmacotherapy, which is likely beneficial only in the early stages of the gynecomastia, surgery can be performed at any time.  Surgery is considered quite effective in the treatment of gynecomastia.  The current minimally invasive techniques to perform surgery for the treatment of gynecomastia may offer faster recovery and lower rates of complications.  Surgery to remove the gynecomastic growth has a low risk of complications.  In deciding whether the surgery is medically necessary for the patient, medical providers such as Kaiser Permanente and insurers such as Blue Cross Blue Shield and Anthem will opt for the surgical procedure as a medical necessity when the conventional medical treatment has failed in treating the growth and when pain persists.  The American Society of Plastic Surgeons recommends that health insurance companies provide coverage for patients undergoing surgical treatment for gynecomastia if the patient is experiencing pain and discomfort.  (Pl.'s SUDF 38-46, Exs. V-Z, AA-DD.)

1   According to Dr. Young, gynecomastia can be a painful condition.  Surgery can be used to treat

2   pain caused by gynecomastia.  (Pl.'s SUDF 47-54, Exs. V-X, Z, AA-BB, DD-EE.)

3   II.  Plaintiff's Arguments

4            Counsel for plaintiff argues that the evidence in this case demonstrates that

5   defendants Traquina and Noriega were deliberately indifferent to plaintiff's serious medical

6   needs.  Counsel for plaintiff observes that in defendants' professional opinion, the preferred

7   course of treatment for plaintiff's gynecomastia was a wait and see approach.  However, counsel

8   contends, the evidence indicates that by the time they made the decision to deny plaintiff's

9   request for surgery, the defendants knew the wait and see approach had failed as a treatment to

10  cure plaintiff from his gynecomastia as well as the pain caused by his condition.  (Pl.'s Mem. of

11  P. & A. at 15-20 & Pl.'s Reply at 9-13.)

12           Plaintiff's counsel asserts that the evidence shows Dr. Eisenberg and Dr. Young

13  recommended surgical removal of plaintiff's gynecomastia.  Moreover, counsel contends that the

14  evidence fails to show that defendants took plaintiff's increasing physical pain into account when

15  they denied his request for surgery.  Rather, the evidence establishes that the defendants based

16  their decision merely on whether surgery would be considered "cosmetic" in nature and could be

17  performed under the governing regulations.  (Pl.'s Mem. of P. & A. at 16-20 & Pl.'s Reply at 9-

18  13.)

19                    **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

20  I.  Defendants' Statement of Undisputed Facts and Evidence

21           The defendants' statement of undisputed facts is supported by citations to a

22  declaration signed under penalty of perjury by defendant Traquina.  It is also supported by

23  citations to plaintiff's complaint and the transcripts of Dr. Eisenberg's and Dr. Young's

24  depositions.  Finally, defendants have submitted a separate response to plaintiff's statement of

25  undisputed facts.

26  /////

1    The evidence submitted by the defendants establishes the following.  After

2  transferring to CSP-Solano, plaintiff received a physical examination and a comprehensive work

3  up and was diagnosed with gynecomastia with no underlying condition that needed treatment.

4  Plaintiff saw two outside specialists for evaluation, Dr. Eisenberg and Dr. Young.  The

5  specialists confirmed the gynecomastia diagnosis, ruled out any underlying causes that needed

6  treatment, and recommended surgery.  (Defs.' SUDF 1, 4-5, Traquina Decl. & Ex. A.)

7    Based on diagnosis and evaluations, plaintiff received conservative treatment

8  including observation and symptomatic treatment with anti-inflammatories such as Motrin.  The

9  MARC, of which defendants were members, twice denied plaintiff's request for surgery because

10 it was found not to be medically necessary and considered cosmetic.  Providing of cosmetic

11 surgery is prohibited by the California Code of Regulations and CDCR policy.  (Defs.' SUDF 6-

12 7, 4-5, Traquina Decl. & Ex. A.)

13    In May 2009, Dr. Traquina examined plaintiff and observed that his gynecomastia

14 had decreased in size.  In his professional opinion as a Board certified surgeon, the conservative

15 treatment plaintiff received was medically acceptable and preferable to the more radical surgical

16 treatment, which has the risk of bleeding, infection, and scarring.  Defendant Traquina declares

17 that he tried at all times to treat plaintiff with dignity and respect in an honest effort to treat his

18 condition.  In addition, he declares that at no time did he or defendant Noriega refuse to provide

19 plaintiff with medical care and treatment, and at no time did they intentionally or knowingly

20 cause plaintiff any pain, suffering, injury, or harm.  (Defs.' SUDF 8-12, Traquina Decl. & Ex. A.)

21    In July and August 2010, Dr. Eisenberg and Dr. Young were deposed.  At their

22 depositions, they confirmed that plaintiff's requested surgery is not medically necessary and is

23 unlikely to effect the pain of which he complains.  They also testified that, in their opinion, the

24 gynecomastia does not present a substantial risk of injury or harm to plaintiff.  (Defs.' SUDF 13,

25 Eisenberg Dep., Young Dep.)

26 /////

II.  Defendants' Arguments

Defense counsel argues that under the undisputed facts of this case neither defendant Traquina nor defendant Noriega was deliberately indifferent to plaintiff's medical needs.  Specifically, defense counsel argues that the defendants provided plaintiff with an appropriate course of treatment for his condition.  Defendants Traquina and Noriega determined that surgery was not medically necessary but was cosmetic.  Plaintiff's outside specialists, Dr. Eisenberg and Dr. Young, have since confirmed defendants' opinion regarding the appropriate treatment.  Defense counsel contends that plaintiff has received all reasonable and necessary care and is receiving treatment that is less risky and preferable to the surgery he requests.  (Defs.' Mem. of P. & A. at 11-12 & Defs.' Reply at 2.)

Moreover, defense counsel contends, there is no evidence that defendants had actual knowledge of a substantial risk of serious harm to plaintiff.  Defense counsel argues that, in fact, all of plaintiff's physicians agree that his condition does not pose a substantial risk of serious harm to him without surgery.  Finally, defense counsel notes that plaintiff has submitted no expert testimony regarding the appropriate treatment for his condition, much less any evidence that the care provided by defendants amounted to deliberate indifference.  Accordingly, defense counsel concludes that defendants are entitled to summary judgement.  (Defs.' Mem. of P. & A. at 11-12 & Defs.' Reply at 2.)

## ANALYSIS

The Ninth Circuit has made clear that "when parties submit cross motions for summary judgment, [e]ach motion must be considered on its own merits."  Fair Hous. Council of Riverside County v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).  Accordingly, the undersigned makes the following findings and recommendations with respect to on each party's motion.

/////

/////

I.  Plaintiff's Serious Medical Needs

The parties do not dispute, and this court finds once more that, based on the evidence presented by the parties in connection with the pending motions, a reasonable juror could conclude that plaintiff's left breast gynecomastia and related pain constitute an objective, serious medical need.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose."). Specifically, the record in this case demonstrates that plaintiff repeatedly sought and received medical care for his condition from medical personnel at CSP-Solano, including both of the defendants, and from two outside medical specialists.  In light of plaintiff's medical history as well as the observations and treatment recommendations by several doctors, a reasonable juror could conclude that failure to treat plaintiff's gynecomastia and related pain could result in "further significant injury" and the "unnecessary and wanton infliction of pain."  See McGuckin, 974 F.2d at 1059.  Accordingly, the pending cross motions for summary judgment hinge on whether, based upon the evidence before the court, the defendants responded to plaintiff's serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

II.  Defendants' Response to Plaintiff's Serious Medical Needs

As to plaintiff's motion for summary judgment, the court will assume for the sake of argument that plaintiff has met the initial burden of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care provided to plaintiff. However, on plaintiff's motion for summary judgment, the court is required to believe defendants' evidence and draw all reasonable inferences from the facts before the court in

defendants' favor.  Drawing all reasonable inferences in defendants' favor, the court finds that they have submitted sufficient evidence to create a genuine issue of material fact with respect to plaintiff's claim that they responded to his serious medical needs with deliberate indifference. See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

        Specifically, defendants' evidence establishes that, based on plaintiff's diagnosis and evaluations, they provided him with a conservative course of treatment, including continued observation and symptomatic treatment with anti-inflammatories such as Motrin.  The MARC, of which defendants were members, twice denied plaintiff's request for surgery because it was not medically necessary and would be cosmetic.  (Traquina Decl.)  Plaintiff maintains that he needs surgery and has submitted evidence in the form of medical records indicating that  two outside specialists, Dr. Eisenberg and Dr. Young, recommended surgery for his condition.  However, it is well established that a mere difference of opinion between a prisoner and prison medical staff as to the proper course of medical care does not give rise to liability on a § 1983 claim.  See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not constitute cruel and unusual punishment."); Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at 332; Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion.").  Likewise, a difference of opinion between doctors also does not give rise to liability on a § 1983 claim.  See Toguchi, 391 F.3d at 1059-60 ("Dr. Tackett's contrary view was a difference of medical opinion, which cannot support a claim of deliberate indifference."); Sanchez, 891 F.2d at 242 (difference of opinion between medical personnel regarding the need for surgery does not amount to deliberate indifference to a prisoner's serious medical needs).

        To establish that a difference of medical opinion as to the appropriate course of treatment amounted to deliberate indifference, the evidence must "show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that "they

1   chose this course in conscious disregard of an excessive risk to [the prisoner's] health." <u>Jackson</u>,

2   90 F.3d at 332.  Here, defendants have submitted evidence that demonstrates that their course of

3   treatment was medically acceptable including, most importantly, the recent deposition testimony

4   from Dr. Eisenberg and Dr. Young.  In this regard, Dr. Eisenberg testified as follows:

> Q: Now, treatment options for this condition – and I'm talking about Mr. Fryman's condition in particular – would a conservative approach be one treatment option; a conservative approach being observation, annual mammograms and treating any discomfort with anti-inflammatories?
>
> A: That would certainly be an option.
>
> Q: And that would be a reasonable medical option; correct?
>
> A: Yeah, a lot of times it really depends on the individual.  There are – any time we have multiple options available for treatment, my practice is to discuss them with the patient and see which they think they would prefer to have done.  And partly it depends on how much physical or mental distress it is causing.

13  (Eisenberg Dep. at 44.)

> Similarly, Dr. Young testified as follows:
>
> Q: Now, there is a conservative approach, correct, which would be just to observe yearly mammograms and treat with anti-inflammatories; correct?  I mean, I understand you're a surgeon, but presumably?
>
> A: There are always ways of just leaving it alone.  Correct.  I'm not aware that anti-inflammatories actually correct the process.
>
> Q: But taking a conservative approach, not doing surgery, is a course of treatment; correct?
>
> A: Correct.  Absolutely.
>
> Q: And that's a medically acceptable course of treatment, medically speaking; correct?
>
> A: Correct.
>
> Q: There is also surgery.  And you told me when we spoke on the phone that that wasn't medically necessary for the patient's physical health; correct?

26  /////

17

1          A: I don't think that gynecomastia would harm him in a medical
2          way.

3   (Young Dep. at 34-35.)

4          Defendants' evidence demonstrates that defendants Traquina and Noriega did not

5   choose the particular course of treatment at issue in this action in conscious disregard to a

6   substantial risk of injury or harm to plaintiff's health.  Specifically, Dr. Eisenberg and Dr. Young

7   testified at their depositions that there is no substantial risk of serious physical harm to plaintiff if

8   he does not undergo surgery.  In that regard, Dr. Eisenberg testified as follows:

9          Q: Without surgery, you didn't have any particular reason to
           believe that in Mr. Fryman's case that he would have – that you
10         would have expected him to be at substantial risk of serious
           physical harm without the surgery if there was follow-up
11         observations of mammograms; correct?

12         A: Yeah, I don't think so.

13  (Eisenberg Dep. at 47.)

14         Similarly, Dr. Young testified as follows:

15         Q: And as far as you know I think you explained it's not likely to
           lead to further significant physical injury if the conservative
16         approach of not doing surgery is followed; correct?

17         A: Correct.

18  (Young Dep. at 35.)

19         In sum, based on the record in this case, the court finds that a reasonable jury

20  could conclude that defendants Traquina and Noriega were not deliberately indifferent to

21  plaintiff's medical needs and therefore did not violate his rights under the Eighth Amendment.

22  Accordingly, plaintiff's motion for summary judgment should be denied.

23         As to defendants' motion for summary judgment, the court finds that defendants

24  Traquina and Noriega have borne the initial responsibility of demonstrating that there is no

25  genuine issue of material fact with respect to the adequacy of the medical care provided to

26  plaintiff.  However, in considering defendants' motion for summary judgment, the court is

18

1    required to believe plaintiff's evidence and draw all reasonable inferences from the facts before

2    the court in plaintiff's favor.  Drawing all reasonable inferences in plaintiff's favor, the court

3    finds that plaintiff has failed to submit sufficient evidence to create a genuine issue of material

4    fact with respect to his claim that the defendants responded to his serious medical needs with

5    deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

6            Specifically, plaintiff claims that defendants have been deliberately indifferent to

7    his medical needs because they refuse to authorize surgery for him and instead continue to

8    employ this "wait and see approach" to his treatment.  However, as discussed above, a mere

9    difference of opinion between a prisoner and prison medical staff or between medical

10   professionals as to the proper course of medical care does not give rise to liability on a §1983

11   claim.  See Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at 332.

12           Plaintiff has simply not come forward with evidence demonstrating that the course

13   of treatment the defendants chose for him was medically unacceptable under the circumstances.

14   Although Dr. Eisenberg and Dr. Young recommended plaintiff undergo surgery at one time, they

15   have since testified under penalty of perjury that the course of treatment employed by defendants

16   was also medically acceptable.  (Eisenberg Dep. at 44, Young Dep. at 34-35.)  In this regard, this

17   case is distinguishable from cases in which prison officials and doctors deliberately ignored the

18   express orders of a prisoner's treating physician.  See, e.g., Jett, 439 F.3d at 1097-98 (finding a

19   triable issue of fact as to whether a prison doctor was deliberately indifferent to a prisoner's

20   medical needs when he decided not to request an orthopedic consultation as the prisoner's

21   emergency room doctor had previously ordered); Hamilton v. Endell, 981 F.2d 1062, 1067 (9th

22   Cir. 1992) (finding a triable issue of fact as to whether prison officials were deliberately

23   indifferent to prisoner's serious medical needs when they relied on the opinion of a prison doctor

24   instead of the opinion of the prisoner's treating physician and surgeon), abrogated in part on

25   other grounds by Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1045 (9th Cir. 2002).  See

26   also Estelle, 429 U.S. at 104-05 (holding that deliberate indifference may manifest "by prison

1  doctors in their response to the prisoner's needs or by prison guards in intentionally denying or

2  delaying access to medical care or intentionally interfering with the treatment once prescribed");

3  Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (holding that a prisoner may establish

4  deliberate indifference by showing that a prison official intentionally interfered with his medical

5  treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) (holding that "a

6  prison official acts with deliberate indifference when he ignores the instructions of the prisoner's

7  treating physician or surgeon.").

8           Nor has plaintiff provided evidence showing that defendants Traquina and

9  Noriega chose the particular course of treatment at issue in conscious disregard of an excessive

10  risk to plaintiff's health.  In fact, as noted above, Dr. Eisenberg and Dr. Young testified during

11  their depositions that there is no substantial risk of serious physical harm to plaintiff if did not

12  undergo surgery, so long as he received follow-up observation and mammograms.  Moreover,

13  according to plaintiff's medical records, his condition has improved at times.  For example, in

14  May of 2009, defendant Traquina examined plaintiff and observed that he had "small

15  gynecomastia" on his left breast compared to when Dr. Eisenberg measured plaintiff's

16  gynecomastia at 8 to 9 centimeters in October of 2006.  (Traquina Decl. & Ex. A.)

17           Finally, insofar as plaintiff has experienced pain because of the gynecomastia, and

18  sought treatment of such from prison medical personnel, it is undisputed that he was repeatedly

19  prescribed Motrin "as needed."  Although plaintiff maintains that he needs surgery to alleviate

20  his pain, he has come forward with no evidence that the surgery he desires would be effective in

21  addressing any pain he suffers as a result of this condition.  In fact, both Dr. Eisenberg and Dr.

22  Young testified at their depositions that the conservative course of treatment the defendants have

23  elected to administer was medically acceptable, even in light of plaintiff's ongoing complaints

24  regarding pain.  In this regard, Dr. Eisenberg testified in his deposition as follows:

25              Q: Okay.  But after – if the condition has been present for three
                years, would you consider that the conservative approach is not
26              really working in order to treat the condition?

A: Well, if I had observed it for three years – if I had observed it for three years – when you base on history, you're always basing it on other people's interpretation of what's happening, so I would only make a recommendation on my personal observations.

Q: Now assume it's December 2009 and you were to examine Mr. Fryman again.  If you had found a tender mass, let's say 3 by 4 centimeters in width, would you say that the – would you actually say the conservative approach was the proper approach to be taking?

A: If it was 3 or 4 centimeters in width in December 2009?

Q: Yes.

A: So in other words, what you're suggesting is it maybe had some decreased some from my examination in October 2006?

Q: Yes, but the patient is still complaining about pain, tenderness.

A: That would be a hard call to make.  I would have to really examine the patient myself.  It would be a matter of how tender it was, what the tissue actually felt like, if it was more like scar tissue or fibrosis and the degree of thickness of the tissue.

I think the fact that it had decreased in size over a three-year period might be a condition for saying, well, let's see what happens over another year or two following a conservative approach.

(Eisenberg Dep. at 56-57.)[2]

Similarly, Dr. Young testified during his deposition as follows:

Q: So, Dr. Young, if a patient is complaining about pain due to his gynecomastia, and if he states that this pain has been – you know, has been continuing, would you actually recommend the conservative approach as described by counsel for defendant?

/////

/////

_____

   [2] Dr. Eisenberg also opined that the conservative course of treatment pursued by defendants of plaintiff's medical condition could not be considered malpractice.  (Eisenberg Dep. at 45.)  Of course, as noted above, mere medical malpractice or negligence will not support a claim of constitutionally inadequate medical care under the Eighth Amendment.  Estelle, 429 U.S. at 105-06; Broughton, 622 F.2d at 460; (9th Cir. 1980); McGuckin, 974 F.2d at 1059; Toguchi, 391 F.3d at 1057.  Dr. Eisenberg also took the position that, based on his examinations of plaintiff, his condition would not interfere with the normal activities of daily life.  (Eisenberg Dep. at 49.)

1    A: I would not let the pain change my opinion about whether or not
     he needs surgery.  If I may explain the reason why is if it's causing
2    him pain, I'm not sure that the surgery would alleviate it.

3    Q: Why is that?

4    A: Because it's just in my experience that sometimes people have
     pain in that area, I attribute it to the gynecomastia, and after
5    surgery they still have the pain.  So I don't tell the patient that it
     will feel better afterwards largely because that's not something I
6    can deliver on.

7    (Young Dep. at 42.)

8           It is important to emphasize that plaintiff relies almost solely on the fact that Drs.

9    Eisenberg and Young, physicians from outside the prison, recommended that he have surgery for

10   his condition.  However, when questioned at their recent depositions, Drs. Eisenberg and Young

11   testified that the conservative course of treatment followed by defendants was medically

12   acceptable and that there was no assurance that surgery would address plaintiff's complaints of

13   pain or discomfort.  Given this very specific testimony from the outside physicians plaintiff relies

14   upon in claiming that the only medically acceptable treatment for his condition was surgery, the

15   undersigned must conclude that plaintiff has failed to make a showing sufficient to establish the

16   existence of an element essential to his case and on which he would bear the burden of proof at

17   trial.  Celotex Corp., 477 U.S. at 323.  In light of this evidence, defendants' decision to continue

18   a conservative course with respect to the treatment of plaintiff's gynecomastia does not reflect

19   deliberate indifference to plaintiff's serious medical needs.  In sum, based on the evidence

20   submitted in connection with the pending motions, the undersigned finds that a reasonable jury

21   could not conclude that defendants Traquina and Noriega were deliberately indifferent to

22   plaintiff's medical needs in violation of plaintiff's rights under the Eighth

23   /////

24   /////

25   /////

26   /////

1   Amendment.  Accordingly, defendants motion for summary judgment should be granted.[3]

2                                            **CONCLUSION**

3              Accordingly, IT IS HEREBY RECOMMENDED that:

4              1.  Plaintiff's September 3, 2010 motion for summary judgment (Doc. No. 61) be

5   denied;

6              2.  Defendants' October 1, 2010 motion for summary judgment (Doc. No. 69) be

7   granted; and

8              3.  This action be closed.

9              These findings and recommendations are submitted to the United States District

10  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

11  one days after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties.  Such a document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14  shall be served and filed within seven days after service of the objections.  The parties are

15  advised that failure to file objections within the specified time may waive the right to appeal the

16  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17  DATED: February 3, 2011.

18

19

20  DAD:9
    frym2636.57(3)

_Dale A. Drozd_

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

21

22

---

23        [3]  Defense counsel has submitted a series of formal objections to plaintiff's evidence.  In
    light of the findings and recommendations set forth herein, the court need not address these
24  objections.  Plaintiff's counsel has also submitted objections to parts of defendant Traquina's
    declaration and a portion of Dr. Young's deposition under Rule 702 of the Federal Rules of
25  Evidence regarding testimony by experts.  These objections are overruled.  For purposes of
    summary judgment, neither of these doctors have been deemed experts.  However, as treating
26  and examining physicians their testimony constitutes relevant and admissible evidence.